# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

PAULA ANN NADEAU,                   )
                                    )
            Plaintiff,              )
                                    )        **Civil Action No.**
        v.                          )        **14-10160-FDS**
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner, Social Security       )
Administration,                     )
                                    )
            Defendant.              )
_____

## MEMORANDUM AND ORDER ON DEFENDANT'S
## <u>MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

**SAYLOR, J.**

This is an appeal of the final decision of the Acting Commissioner of the Social Security

Administration denying an application for Social Security Disability Insurance ("SSDI") and

Supplemental Security Income ("SSI") benefits. Plaintiff Paula Ann Nadeau appeals the denial

of her application for benefits on the grounds that the decision is not supported by substantial

evidence under 42 U.S.C. §§ 405(g) and 1383(c)(3). In her application, she alleged that she

became disabled on October 30, 2006, due to bipolar disorder, depression, and anxiety. She now

disputes the administrative law judge's holding that she is not "disabled" within the meaning of

the Social Security Act, 42 U.S.C. §§ 423(c), (d), and 1382c(a)(3)(A). She also contends that the

administrative law judge improperly failed to consider the opinion evidence of her treating

therapist.

Pending before the Court is Nadeau's appeal and the Commissioner's motion to affirm. For the reasons stated below, the decision of the Commissioner will be confirmed.

## I.    Background

### A.    Education and Occupational History

Paula Ann Nadeau was born in 1962. (AR 59, 129). Although there have been conflicting accounts of her education, the administrative law judge found that she has at least a high school education. (AR 59).[1] However, she did not receive a high school diploma, and did not continue her education. (AR 13-14).

Nadeau's occupational history consists predominately of work as a cashier and hand-packaging at several businesses. (AR 18-19, 138-140, 180). From 1988 to 1995, she worked at a bakery as counter help. (AR 180). From 1996 through 2006, her earning records indicate that she worked for 11 different employers. (AR 138-140). Although she did not perform the same type of work for each employer, her job functions included work as a hand packager, assistant, cashier, and counter help. (AR 18-19, 40, 180). She has not worked since October 30, 2006. (AR 16, 53, 59).

### B.    Medical History

#### 1.    Physical Impairments

Nadeau testified during the administrative hearing on September 13, 2012, that she suffers from bone spurs in her spine. (AR 19). According to Nadeau, her bone spurs limit her ability to lift objects and stand in one place for a lengthy period of time. (AR 21-22). She

---

[1] At the oral hearing before the administrative law judge, Nadeau stated that she completed the twelfth grade. (AR 14). However, the Consultative Examination Report states that she only finished the tenth grade. (AR 634). In her Memorandum in Support, she stated that she only finished the ninth grade. Pl. Mem. 2.

testified that she was not taking medication for the condition, and has never had any medical procedure or surgery done to treat it. (AR 19-20).

From August 13, 2007 to September 29, 2008, Nadeau reported to her primary-care physician, Dr. Nasim Ghaffar, that she was experiencing "acute low back pain." (AR 316-26, 341-42). At each examination within this time period, Dr. Ghaffar noted that she exhibited moderate "paraspinal tenderness [and] paraspinal spasm." (AR 316, 319, 321, 323, 325, 342). Dr. Ghaffar, however, also noted that she maintained a normal motor system, sensory reflexes, and gait. (AR 316, 319, 321, 323, 325, 342). Dr. Ghaffar prescribed medication for lower back pain. (AR 317, 320, 322, 324, 326).[2]

In October 2007, Dr. Ghaffar referred her to Dr. Lawrence P. Johnson to evaluate her back pain. (AR 285-86). In a letter dated October 15, 2007, Dr. Johnson noted that she had suffered back and left shoulder pain since 2003 due to a motor vehicle accident. (AR 285). After the accident, an MRI of the cervical spine was ordered, revealing "some degenerative changes at the C spine and a slight protruding disk at C5-6." (*Id.*). In the letter, Dr. Johnson noted that his examination revealed no "acute distress," with "mildly reduced back [range of motion]," "[f]ull hip ROM," and "[g]ood neck ROM." (AR 285).

On July 29, 2009, Dr. Kevin S. Tomany sent a letter to Dr. Ghaffar stating that Nadeau's "c-spine is nontender and she has good cervical range of motion." (AR 273).

In a Consultative Examination Report dated October 19, 2011, Dr. Robert Sampson noted that Nadeau complained about her pain in her spine, sciatica, and lower back. (AR 636). She reported that the pain could be a 9 on a scale of 1-10. (*Id.*).

---

[2] Dr. Ghaffar prescribed Motrin, Norflex, and Percocet to treat her lower back pain. (AR 317).

Dr. Ghaffar also advised her to lose weight. (AR 314-383). According to her testimony on September 28, 2012, she is 5' 2" tall and weighs 160 pounds. (AR 13). Her body mass index (BMI) is therefore approximately 29.3.[3]

## 2.    Mental Impairments

### a.    Nasim Ghaffar, M.D.

Between August 13, 2007, and June 30, 2011, Nadeau was evaluated for psychological issues by Dr. Ghaffar. (AR 262, 314-383). On August 13, 2007, Dr. Ghaffar performed an initial assessment, and prescribed Effexor and Trazodone to treat depression and anxiety. (AR 315).

On May 19, 2008, Nadeau reported to Dr. Ghaffar that she was "feeling a little depressed off & on", and "a little anxious off & on." (AR 333). Dr. Ghaffar found her mood to be stable, pleasant, and happy with normal energy and adequate grooming. (AR 333-34). She continued to receive medication for depression and anxiety after the examination. (AR 334). On June 19, 2008, Dr. Ghaffar noted similar findings. (AR 335). Dr. Ghaffar continued prescribing medication to treat Nadeau's depression and anxiety, while also recommending counseling. (AR 335-36).

Through May 26, 2011, Dr. Ghaffar continued to treat Nadeau for depression and anxiety, finding that she was doing well and that the medication was having a significant benefit. (AR 339, 343, 346, 348, 351, 355, 362, 370, 373, 375, 378, 382). Dr. Ghaffar also noted that her

---

[3] BMI is "a measure of body fat based on height, and weight that applies to adult men and women." National Heart, Lung, and Blood Institute, *Calculate Your Body Mass Index*, U.S. Department of Health & Human Services (last visited January 28, 2015, at 11:18 A.M.), http://www.nhlbi.nih.gov/health/educational/ lose_wt/BMI/bmicalc.htm. A BMI of between 25-29.9 is overweight, whereas a BMI over 30 is considered obese.

mood was stable, normal, and happy, and that she maintained adequate grooming and normal eye contact. (AR 344, 349, 352, 356, 359, 363, 371, 374, 376, 379).

On May 26, 2011, Nadeau requested that Dr. Ghaffar fill out her disability forms for her depression and anxiety. (AR 365). She reported that she was feeling depressed intermittently, but felt "ok" most days. (*Id.*). As for anxiety, she stated that she had more frequent panic attacks and was feeling anxious on and off. (*Id.*). Dr. Ghaffar noted that her mood was anxious but pleasant with decreased energy, adequate grooming, and normal eye contact. (AR 365-366). Dr. Ghaffar continued to prescribe medication for depression and anxiety. (AR 366).

During the follow-up examination, on June 30, 2011, Dr. Ghaffar noted that her depression and anxiety were doing well and that she had normal energy with a pleasant mood, adequate grooming, and normal eye contact. (AR 367-68). Dr. Ghaffar continued medication and advised counseling. (AR 368).

### b. South Bay Mental Health

Beginning on April 20, 2010, Nadeau began mental-health treatment at South Bay Mental Health. (AR 384, 416). She was seen initially by Paul Miller, M.S. (AR 416, 409). During the initial examination, Miller found her to be positive in response to intervention. (AR 416). On May 7, 2010, Miller found her to be feeling good. (AR 414, 415). On May 21, 2010, Miller noted that she was "depressed but kind of friendly." (AR 413). He also noted that she suffered from bipolar disorder, depressive type, and a panic disorder with agoraphobia, and scored a 60 on the Global Assessment and Functioning ("GAF") scale. (AR 454).[4]

---

[4] The GAF Scale is used by clinicians to state their overall assessment of a patient's functioning. The scale is divided into ten ranges of functioning between 0 and 100. A person who scores between 51 and 60 on the GAF scale has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts peers or coworkers)." Marcia

On July 28, 2010, Nadeau began seeing George Mugerwa, M.S. (AR 409, 601-08). From the first session up through May 2011, Mugerwa noted that she was engaged and cooperative as to her response to intervention. (AR 388-409, 512-16). On October 10, 2010, Mugerwa reported that she was gaining control of her anger, but still struggling with emotional outbursts. (AR 311). During the same examination, Mugerwa diagnosed her with bipolar disorder, depressive type, and anxiety disorder. (AR 310). She scored a 52 on the GAF scale. (*Id.*).

On February 1, 2011, Mugerwa noted noticeable changes in dealing with her anger, and that she was doing well on medications. (AR 305). However, he also noted that she still experienced panic attacks, and diagnosed her with bipolar disorder, depressive type, and panic disorder with agoraphobia. (AR 304-05). She scored a 50 on the GAF scale. (AR 304).[5]

On April 18, 2011, Mugerwa noted that there was a reduction in symptoms, but that she still had anger and anxiety issues. (AR 299, 301). Mugerwa diagnosed bipolar disorder, depressive type, and panic disorder with agrophobia. (AR 298). She scored a 48 on the GAF scale. (*Id.*).

On March 4, 2011, Mugerwa filled out a "Psychiatric Disorder" questionnaire. (AR 384-86). On the questionnaire, Mugerwa diagnosed bipolar disorder, depressive type, and fear of crowds and social environments, and noted that she is overwhelmed with lower energy and

Stanhope & Ruth N. Knollmueller, HANDBOOK OF PUBLIC AND COMMUNITY HEALTH NURSING PRACTICE 216 (2d ed. 2001).

[5] A GAF score of 41-50 is described as "serious symptoms," which include suicidal ideation or severe obsessional rituals. Such a score also indicates serious impairment in social, occupational or school functioning. ACCESS Behavioral Health, *Global Assessment of Function* ACCESS (last visited on Jan. 21, 2015 at 9:35 A.M.), https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf.

sadness. (AR 384). Mugerwa noted that she has minimal functioning outside of highly

structured living or day treatment settings and her daily functioning is defined by her mood.

(*Id.*). As to employment, Mugerwa answered that she is withdrawn when depressed, gets

nervous around public transportation, does not handle change well, but only requires minimal

supervision. (AR 385).

On June 27, 2011, Mugerwa began another action plan for her anger and depression with

the goal of controlling her anger and coping with daily stress without anxiety and depression.

(AR 289-293). On September 19, 2011, Mugerwa noted anger outbursts and anxiety over the

responsibility of taking care of her home. (AR 735). She scored a 55 on the GAF scale.[6] (AR

734). Nadeau continued to see Mugerwa through September 2012. He noted that she was

active, cooperative, and/or engaged in response to intervention. (AR 671-686, 749-752). In

September 2012, Mugerwa and Mary Cancellieri, PMHCNS, filled out a "Mental Residual

Functional Capacity Form," noting a diagnosis of "bipolar disorder and generalized anxiety

disorder." (AR 755-57). Mugerwa and Cancellieri noted that her understanding, memory,

ability to carry out simple instructions, and ability to get along with coworkers were moderately

limited, whereas her ability to carry detailed instructions, sustain a routine, ability to make

simple work-related decisions, and ability to complete a normal workday/week without

interruptions from psychologically based symptoms were markedly limited. (AR 755-56).

---

[6] A GAF score of 51-60 is described as "moderate symptoms," which include occasional panic attacks. Such a score also indicates moderate difficulty in social, occupational or school functioning. ACCESS Behavioral Health, *Global Assessment of Function* (last visited on Jan. 21, 2015 at 9:35 A.M.), ACCESS https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf.

In letters dated May 3 and November 7, 2011, and June 18, 2012, Mugerwa stated that, from the client's reports and examinations, Nadeau showed signs of a chronic mental disability, preventing her from doing substantial gainful work.  (AR 663-65).

### c.    Consultative Examiner - Dr. Sampson, M.D.

A consultative examination report was conducted by Dr. Sampson on October 19, 2011. (AR 633-638).  Dr. Sampson noted that Nadeau "appears anxious and cries easily," but that "her thought form is logical and goal-directed without evidence of hallucinations or delusions."  (AR 635).  He also reported that she is "oriented to person, place and time," and that her "[j]udgement on routine testing is intact."  (*Id.*).  During the examination, she scored a 27/30 on the Mini-Mental Status Exam.[7]  (*Id.*).  Dr. Sampson diagnosed her with "anxiety disorder" and "mood disorder."  (AR 636-37).  She scored a 52 on the GAF scale.  (AR 637).

### d.    State Agency Psychologists

On March 23, 2011, Jan Jacobsen, Ph.D., performed a Mental RFC Assessment on Nadeau.  (AR 418-421).  Dr. Jacobsen concluded that her understanding and memory were not significantly limited.  (AR 420).  Dr. Jacobsen also concluded that her sustained concentration and persistence were not significantly limited but for Nadeau's ability to maintain attention and concentration for extended periods, which was moderately limited.  (AR 420).  As for social interaction, Dr. Jacobsen noted that her ability to interact appropriately in public was moderately limited, but other social skills and abilities were not significantly limited.  (AR 418).  Finally, Dr. Jacobsen recorded that Nadeau's ability to respond appropriately to changes in the workplace

---

[7] The Mini-Mental Status Exam is a cognitive screening tool, testing cognitive impairment.  VC Pangman, et. al., An Examination of Psychometric Properties of the Mini-Mental Examination and the Standardized Mini-Mental Examination: Implications for Clinical Practice, Applied Nursing Research, Vol. 13, Iss. 4 (209-213).

was moderately limited, but her ability to adapt to normal hazards, public transportation, and independent plans was not significantly limited. (AR 418). Overall, Dr. Jacobsen concluded that Nadeau was "able to understand and remember simple and detailed instructions;" "able to sustain attention for simple and detailed tasks for extended periods;" "able to sustain basic demands;" and "able to respond appropriately to changes in a routine work setting." (AR 419).

On October 26, 2011, Nancy Keuthen, Ph.D., also completed a Mental RFC Assessment on Nadeau. (AR 639-656). Dr. Keuthen noted that Nadeau was not significantly limited in her understanding and memory. (AR 653). However, Dr. Keuthen also noted that Nadeau was moderately limited when it came to detailed instructions, ability to maintain concentration for extended periods, ability to work with others, ability to perform tasks on schedule, and ability to complete a normal workday/week without interruptions from psychologically based symptoms. (653-54). Dr. Keuthen also recorded that Nadeau was moderately limited in her ability to accept instructions and criticism from supervisors. (AR 654). Overall, Dr. Keuthen concluded that Nadeau could "understand and recall simple and complex work tasks;" "sustain focus for 2-hr increments on work tasks;" "interact infrequently with the public around structured job-tasks;" and "negotiate predictable work tasks." (AR 655). However, Dr. Keuthen also concluded that she may miss one to three days of work a month because of her difficulty with leaving her house. (*Id.*).

### C.  Daily Activities

In her testimony before the administrative law judge, Nadeau indicated that her daily activities included watching television, reading magazines, visiting friends, and solving puzzles. (AR 14, 31, 33-35). She also testified that she is computer literate and plays games on her

computer.  (AR 14).  She lives alone in an apartment, but takes care of her personal hygiene and does chores around the apartment, such as cleaning and managing bills.  (AR 13, 30-31, 635). She is unable to drive a car and has her mother provide rides for her.  (AR 15, 30).  She goes grocery shopping every few weeks and has her mother drive her.  (AR 31).

Nadeau testified that she does not sleep well and takes sleep medication such as amitriptyline.  (AR 34).  According to the Consultative Examination Report, she sometimes takes naps during the day.  (AR 635).

### D. Procedural Background

Nadeau applied for SSDI and SSI benefits on December 17, 2010, alleging that she became disabled on October 30, 2006.  (AR 175).  The Commissioner denied her application initially on April 15, 2011, and upon reconsideration on October 27, 2011.  (AR 51).  She requested an administrative hearing on November 3, 2011, which was held on September 13, 2012.  (AR 8-43, 85).

The administrative law judge issued his decision on September 28, 2012, concluding that Nadeau was not disabled.  (AR 48-61).  Nadeau thereafter filed a Request for Review of Hearing Decision/Order on November 30, 2012 with the Appeals Council.  (AR 6-7).  The Appeals Council affirmed the administrative law judge's decision, thereby rendering his opinion the final decision of the Commissioner.  *See* 20 C.F.R. § 405.450.  (AR 1-5).

## II. Analysis

### A. Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. §

405(g). The ALJ's factual findings "if supported by substantial evidence, shall be conclusive,"

42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence, where

reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the

ALJ. It does not fall on the reviewing Court." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001)

(citation omitted); *see Evangelista v. Secretary of Health & Human Servs.*, 826 F.2d 136, 143

(1st Cir. 1987). Therefore, "[j]udicial review of a Social Security Claim is limited to

determining whether the ALJ used the proper legal standards, and found facts based on the

proper quantum of evidence." *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir.

2000). Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*.

*Seavey*, 276 F.3d at 9.

### B.  Standard for Entitlement to SSDI and SSI Benefits

An individual is not entitled to SSDI or SSI benefits unless she is "disabled" within the

meaning of the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1)(A), (d) (setting forth the

definition of disabled in the context of SSDI); *id.* §§ 1382(a)(1), 1382c(a)(3) (same in the

context of SSI). "Disability" is defined, in relevant part, as the "inability to engage in any

substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment

must be severe enough to prevent the plaintiff from performing not only past work, but any

substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).[8]

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that [s]he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4). "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that point, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

## C.     The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4). At step one, he expressly found that Nadeau had not engaged in substantial gainful activity since October 30, 2006, her alleged disability onset date. (AR 53).

---

[8] "Complex regulations, administered by the Commissioner of Social Security prescribe . . . [a] protocol for making a disability decision." *Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir. 2001). "Part 404 of Title 20 regulates [SSDI], which is available to those who have paid social security taxes for the required period; Part 416 regulates [SSI], which applies if a claimant has not paid the requisite taxes. The regulations pertinent here mirror one another, so we refer only to Part [404]" going forward. *Id.* at 2 n.1.

At the second step, the ALJ addressed the severity of Nadeau's impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  He concluded that her "history of hypertension, status post-left radius and ulnar fracture, arthritis, and migraine headaches" were non-severe because they resulted in "minimal, if any, limitation in the claimant's ability to perform work-related activities."  (AR 54).  The ALJ did, however, conclude that she suffered the following severe impairments:  cervical bone spurs, obesity, bipolar disorder, depression, anxiety, and a panic disorder with agoraphobia.  (*Id.*)

At the third step, the ALJ determined whether Nadeau's severe impairments met the requirements of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  He concluded that they did not.  (AR 54).  The ALJ concluded that her bone spurs did not meet a listed impairment because the medical record did not show evidence of "nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis."  (*Id.*)  As for her mental impairments, the ALJ found that she had "mild restriction" in "activities of daily living," and that "her performance of a simple routine is appropriate, effective, and sustainable."  (*Id.*)  He also found that she had "moderate difficulties" in "social functioning," and "moderate difficulties" with "regard to concentration."  (AR 54-55).  The ALJ found no "episodes of decompensation" and no "medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities."  (AR 55).  Nadeau's mental limitations were insufficient to meet the requirements of the listed impairments in §§ 12.04B, 12.04C, and 12.06.

At the fourth step, the ALJ considered Nadeau's "residual functional capacity and [her] past relevant work."  20 C.F.R. § 404.1520(a)(4)(iv).  He noted that she had the residual

functional capacity to perform "light work" with additional limitations. (AR 55).[9]  He also found:

> She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; but never climb ladders, ropes, or scaffolds. She should avoid all exposure to extreme heat, extreme cold, wetness, humidity, or excessive vibration. She is limited to one or two-step tasks. She cannot be around crowds in the workplace and cannot interact with the public, but can have occasional interaction with coworkers. However, she cannot perform tandem tasks.

(AR 55).  Based on the ALJ's conclusion that her ability was limited to "light work," the ALJ concluded that she could not perform any of her past relevant work as a cashier or hand packager.  (AR 59).

Finally, at step five, the ALJ concluded that Nadeau could perform work existing in significant numbers in the national economy based on her age, education, work experience, her residual functional capacity ("RFC"), and the vocational expert's testimony.  (AR 60). Accordingly, the ALJ concluded that Nadeau was not disabled.  (AR 61).

### D.      Plaintiff's Objections

Nadeau raises two main objections to the ALJ's determination that she is not disabled. She first contends that the ALJ failed to give proper weight to the opinions of Mugerwa, her treating therapist, as an "other [medical] source" pursuant to Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *2.  Second, she argues that the ALJ's determination as to the scope of her RFC is not supported by substantial evidence.

---

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. 404.1567(b) and 416.967(b).

1.   **Weight Given to Mugerwa's Opinions**

Nadeau contends that the ALJ failed to give proper weight to several of Mugerwa's opinions. Those opinions were set out in his treatment notes, a "Psychiatric Disorder" form, and a "Mental Residual Functional Capacity Form" filled out by Mugerwa and Cancellieri. (AR 663-740, 384-86, 755-57). In his decision, the ALJ found that Mugerwa was not an "acceptable medical source" pursuant to 20 C.F.R. §§ 404.1513(a), 416.913(a). (AR 57). The ALJ ultimately gave Mugerwa's opinions "little weight" in part because "his opinion was not supported by the vast majority of treatment notes . . . or the claimant's testimony." (AR 57). Nadeau concedes that Mugerwa is not an "accepted medical source," but rather an "other [medical] source" pursuant to 20 C.F.R. §§ 404.1513 (d), 416.913(d). (Pl. Mem. at 4). The issue, therefore, is whether the ALJ gave proper weight to Mugerwa's opinions under that standard.

"Acceptable medical sources" are treating sources, nontreating sources, and non-examining sources that provide evidence about a claimant's impairments. *See* 20 C.F.R. § 404.1502. A treating source includes a claimant's physician, psychologist, or an other "acceptable medical source," pursuant to 20 C.F.R. § 404.1513(a), who has provided medical treatment or evaluation. *See id.* The medical opinions of treating sources may be entitled to controlling weight as to the nature and severity of a claimant's impairments. SSR 06-03p, 2006 WL 2329939, at *2; *Gagnon v. Astrue*, 2012 WL 1065837, at *5 (D. Mass. 2012) ("A treatment provider's opinion is entitled to controlling weight if the 'opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" (quoting C.F.R. § 404.1527(d)(2))); *King v. Astrue*, 2010 WL 4457447, at

*4 (D. Me. 2010). The views of an "other [medical] source" pursuant to 20 C.F.R. §§ 404.1513(d), 416.913(d) can also show the "severity of the individual's impairment(s) and how it affects the individual's ability to function." 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p, 2006 WL 2329939, at *2.

However, an ALJ is given wide discretion in determining the weight to give to the opinion of an "other [medical] source." *Gagnon*, 2012 WL 1065837 at *5; SSR 06-03p, 2006 WL 2329939, at *6. The amount of weight given to such opinion is based on factors listed in 20 C.F.R. § 404.1527(d).[10] Moreover, the ALJ's duty is to consider all relevant evidence, and therefore, the ALJ, in his or her opinion, should give reasons for the weight he or she ultimately assigns to the opinion. SSR 06-03p, 2006 WL 2329939, at *6 (clarifying that an ALJ should explain the weight given or ensure that the discussion of the evidence or decision allows a subsequent reviewer to follow the ALJ's reasoning); *Taylor v. Astrue*, 899 F. Supp.2d 83, 88 (D. Mass. 2012) ("An administrative law judge, however, may not, ignore 'other medical sources' or fail to adequately explain the weight given to such evidence."). Overall, the ALJ is constrained by the duty to reach a conclusion supported by substantial evidence. *Gagnon*, 2012 WL 1065837 at *5 ("When deciding how much weight to give a therapist's opinion, an ALJ is only constrained by the duty to reach a conclusion supported by substantial evidence in the record.").

The ALJ assigned the opinions in Mugerwa's treatment notes "little weight" because they were inconsistent with the treatment notes of Dr. Ghaffar and with Nadeau's testimony. (AR

---

[10] The factors that an ALJ may use to evaluate the opinion of an "other [medical] source" are (1) how long the source has known the individual and how frequently the source has examined the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) the source's specialty or area of expertise; and (6) any other factors, such as the source's understanding of the agency's disability programs and evidentiary requirements. *See* SSR 06-03p, 2006 WL 2329939, at *4-5.

57).  Specifically, the ALJ noted that Dr. Ghaffar, in March and June 2011, found that Nadeau's symptoms were "under good control and that claimant was doing fine."  (AR 57, 363, 368).  From June 2008 through May 2011, Dr. Ghaffar found that she was doing well and noted that her mood was stable, normal, and happy.  (AR 339-382).  By contrast,  in May 2011, Mugerwa found Nadeau's symptoms to be severe, preventing "her from being able to perform any substantial gainful work," and indicating "that the claimant has difficulty staying on task, concentrating, and following directions."  (AR 57, 663).  The ALJ also concluded that Mugerwa's treatment notes were inconsistent with Nadeau's testimony, where she indicated that she could maintain personal hygiene, perform household chores, manage finances, and "interact with various individuals regularly."  (AR 13, 30-31, 57, 635).  Finally, the ALJ noted that Mugerwa's opinions in May 2011 were inconsistent with his own earlier examinations.  (AR 57).  In January 2011, Mugerwa concluded that Nadeau was less irritable and moody with increased energy.  (AR 57, 305, 389-90).

The ALJ thus provided reasons for assigning little weight to Mugerwa's opinions.  Because Mugerwa was an "other [medical] source," he had wide discretion to do so.  *See* 20 C.F.R. § 404.1527(d) (listing as a factor the inconsistency of the opinion with other evidence); *King*, 2010 WL 4457447, at *4 ("In particular, [the administrative law judge] noted that he declined to afford it weight because it was (i) contradicted by the plaintiff's own testimony, (ii) not supported by contemporaneous medical records, and (iii) rendered by an individual who was not an 'acceptable medical source' and thus not entitled to controlling weight.").

Nadeau further contends that the ALJ failed to consider Mugerwa's March 4, 2011 "Psychiatric Disorder" form.  Nadeau notes that the ALJ failed to refer to the form (which, she contends, should have been considered as evidence of "the severity of her impairments and how

it affected her ability to function") in his written decision. SSR 06-03p, 2006 WL 2329939, at

*2. However, the ALJ did not need to cite directly to the form; instead, he only needed to

"ensure that the discussion of the evidence or decision allows a subsequent reviewer to follow

the ALJ's reasoning." SSR 06-03p, 2006 WL 2329939, at *6; *Taylor*, 889 F. Supp. 2d at 88.

One can follow the ALJ's reasoning to grant Mugerwa's opinion "little weight" due to the

inconsistency of his opinion with other treating sources. (AR 57-58). In the "Psychiatric

Disorder" form, Mugerwa noted that Nadeau was overwhelmed with low energy and sadness,

and had minimal functioning outside of highly structured living or day treatment settings. (AR

384). Mugerwa also noted that she could "hardly concentrate" and was "irritated" and "short

tempered" when depressed. (*Id.*) These opinions are inconsistent with Dr. Ghaffar's treatment

notes around the same time, which described Nadeau's mood as stable, normal, or pleasant. (AR

56, 382, 658, 660). Mugerwa's opinions were also inconsistent with those of the state agency

psychologists, Dr. Jacobsen and Dr. Keuthen, to which the ALJ gave "significant weight." (AR

58). In March 2011, Dr. Jacobsen found that Nadeau suffered from moderate limitation in

concentration for extended periods, but could sustain attention for simple and detailed tasks "for

extended periods of two hour segments in an eight hour workday with occasional concentration

problems." (AR 57, 419). In October 2011, Dr. Keuthen came to similar conclusions. (AR 57-

58, 655). Overall, because the ALJ discussed the inconsistency of Mugerwa's opinions and the

evidence of other treating sources, the ALJ adequately ensured that a subsequent reviewer could

follow his reasoning. SSR 06-03p, 2006 WL 2329939, at *6.

Nadeau also contends that the ALJ failed to give proper weight to the "Mental Residual

Functional Capacity Form." Nadeau points out that the ALJ did not cite to the Mental RFC

Form in his decision. (AR 48-66). However, the Mental RFC Form was completed and signed

18

by Cancellieri on September 28, 2012, the same day the ALJ issued his decision.  (AR 61, 757).

The mental RFC also was not appended to the ALJ's decision and therefore shows that it was not

reviewed by the ALJ before he carried out his decision.  AR 62-66; *Mills v. Apfel*, 244 F.3d 1, 5

(1st Cir. 2001); *LeBlanc v. Halter*, 22 Fed. Appx. 28 (1st Cir. 2001) ("LeBlanc relies in part on

medical evidence he submitted to the Appeals Council, but not to the ALJ. As a recent decision

by this court indicates, in reviewing an ALJ decision, we do not consider such new evidence that

was never presented to the ALJ.").

      In *Mills*, the First Circuit held that judicial review of the ALJ's decision must be based

"solely on the evidence presented to the ALJ."  244 F.3d at 5.  However, a claimant may

introduce new and additional evidence upon a request for Appeals Council review.  *See id.* at 4.

When the Appeals Council refuses to review the ALJ's decision, a reviewing court may consider

the additional evidence if the Appeal Council's refusal was based on "an egregiously mistaken

ground."  *See id.* at 5.  Since *Mills*, courts have interpreted the "egregiously mistaken ground"

standard of review differently.  *Shea v. Colvin*, 2013 WL 5952992, at *9 (D. Mass. 2013)

(offering a list of different interpretations).  The court in *Shea* found the standard set forth in

*Ortiz Rosado v. Barnhart*, 340 F. Supp. 2d 63, 67 (D. Mass. 2004), to be the most appropriate.

*Shea*, 2013 WL 5952992, at *10.  In *Ortiz Rosado*, the court found that "if the Appeals Council

is going to be afforded a highly protective standard, *i.e.* egregiousness, by which its decisions are

to be reviewed, it must offer more than a boilerplate justification for its decision."  340 F. Supp.

2d at 68.  Nevertheless, the court in *Ortiz Rosado* also noted that a review of the additional

evidence revealed it was "new and material and, perhaps, contrary to the weight of the other

evidence."  *Id.*; *but see Moore v. Astrue*, 2013 WL 812486, at *15 (D. Mass 2013) ("failure of

[Appeals Council] to explain how it evaluated new evidence presented to it does not

19

automatically require remand").

As in *Shea*, Nadeau has failed to show that the refusal of the Appeals Council to accept the late materials was based on an egregiously mistaken ground. 2013 WL 5952992, at *10. The Appeals Council explained its refusal to review Nadeau's case by a generic notice. (AR 1-5) ("We found no reason under our rules to review the Administrative Law Judge's decision"). However, the mental RFC was not new, material, or contrary to the weight of the other evidence. As noted, the ALJ gave Mugerwa's opinions little weight and concluded that his opinions were inconsistent with other evidence in the record. (AR 57). The mental RFC concluded that Nadeau had "marked limitations" in the "ability to carry out detailed instructions," "maintain concentration," and "perform activities within a schedule." (AR 755-57). Those opinions are in contrast to the state psychologists' RFCs, to which the ALJ gave "significant weight." (AR 57, 419, 655). Dr. Jacobsen and Dr. Keuthen concluded that Nadeau could sustain attention for detailed tasks for extended period of time and had the ability to respond to changes in routine work setting. (AR 419); *see Shea,* 2013 WL 5952992, at *11 (finding that the additional evidence submitted to the Appeals Council was inconsistent with other evidence in the record). Moreover, Mugerwa's and Cancellieri's conclusions were not "new" or "contrary to the weight of the other evidence" because those conclusions were similar to Mugerwa's treatment notes and his "Psychiatric Disorder" form. (*Compare* AR 755-57 *with* AR 384, 663 389-390); *see Roberson v. Colvin*, 2014 WL 243244, at *4 (D.N.H. 2014) ("[W]hen the Appeals Council considers new evidence but concludes that it would not provide a basis for changing the decision, that conclusion is not egregiously mistaken as long as record evidence supports the decision." (citing *Shea* 2013 WL 5952992, at *10-11)); *Moore*, 2013 WL 812486 at *15.

Finally, Nadeau contends that the ALJ mischaracterized Mugerwa's opinions as

concluding that Nadeau was "disabled" and "unable to work." (AR 57). Nadeau argues that the ALJ focused the discussion on who properly has the responsibility to decide whether a person can work or is disabled, rather than the weight to give Mugerwa's opinions themselves. Again, the ALJ gave reasons for granting Mugerwa's opinions little weight. (AR 57). Accordingly, the ALJ properly concluded that the issue of disability is to be decided by the Commissioner and properly weighed Mugerwa's opinions. 20 C.F.R. 404.1527, 416.927(c).

## 2. <u>Whether the Decision Is Supported by Substantial Evidence</u>

Nadeau further contends that the ALJ's conclusion regarding her RFC was not supported by substantial evidence. (AR 55-59). The ALJ found that Nadeau had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with additional limitations. (AR 55).[11] She argues that the ALJ ignored large parts of the record, and the evidence that he did cite relied upon small portions of the medical professionals' opinions.[12]

The "substantial evidence" standard is one where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Miranda v. Secretary of Health, Ed. and Welfare*, 514 F.2d 996, 998 (1st Cir. 1975); *Sousa v. Astrue*, 783 F. Supp. 2d 226, 232 (D. Mass. 2011). Therefore, the ALJ should review all relevant evidence. *Sousa*, 514 F.2d at 232; SSR 06-03p, 2006 WL 2329939, at *6. However, the ALJ is not required to discuss every piece of evidence in the record when making his or her decision. *Santiago v. Secretary of Health and Human Services*, 46 F.3d 1114 (1st Cir. 1995); *Sousa*, 783

---

[11] The ALJ stated as follows: "She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; but never climb ladders, ropes or scaffolds. She should avoid all exposure to extreme heat, extreme cold, wetness, humidity, or excessive vibration. She is limited to one or two-step tasks. She cannot be around crowds in the workplace and cannot interact with the public, but can have occasional interaction with co-workers. However, she cannot perform tandem tasks." (AR 55).

[12] In her brief, Nadeau focused entirely on her mental impairments. Pl. Mem. 7-11.

F. Supp. 2d at 234 ("The hearing officer is not required to—nor could he reasonably—discuss every piece of evidence in the record.").  Furthermore, even if one could come to a different conclusion than the ALJ, the question on judicial review is whether substantial evidence supports the ALJ's decision.  *Robles v. Barnhart*, 2005 WL 1773963, at *4 (D. Mass. 2005) ("If substantial evidence exists to support the ALJ's determination, the Court must accept his findings as conclusive even if the record arguably could justify a different conclusion.").  A reviewing court may reverse or remand the ALJ's decision when the ALJ ignored evidence, or made legal or factual errors.  *Moore*, 2013 WL 812486 at *2; *Robles*, 2005 WL 1773963 at *4.

As for the RFC specifically, the RFC assesses what a claimant "can still do despite [her] limitations."  20 C.F.R. §§ 404.1545(a), 416. 945(a).  The claimant has the burden of providing evidence to establish how her impairments limit her RFC.  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  As stated, an applicant has the burden of production and proof at the fourth step, which includes the assessment of the applicant's RFC.  *Id.*  However, the ALJ maintains the duty to determine a claimant's RFC based upon the entire record.  *See* 20 C.F.R. §§ 404.1545, 404.1546.  In assessing an RFC, the ALJ can "piece together the relevant medical facts from the findings and opinions of multiple physicians."  *Evangelista v. Secretary of Health and Human Services*, 826 F.2d 136, 144 (1st Cir. 1987).

In assessing Nadeau's RFC, the ALJ relied upon several professional observations and opinions.  (AR 55-59); *see Evangelista*, 826 F.2d at 144.  The ALJ gave "significant weight" to the RFC examinations conducted by Dr. Jacobsen and Dr. Keuthen.  (AR 58 (finding that the state agency doctors review of Nadeau's records were consistent with the other evidence provided, including her subjective complaints)); *see Berrios Lopez v. Secretary of Health and Human Services*, 951 F.2d 427, 431 (1st Cir. 1991) (concluding that advisory reports submitted

by non-testifying, non-examining physicians are entitled to evidentiary weight based on the circumstances and can support substantial evidence). The state agency doctors opined that Nadeau could sustain attention to instructions and tasks; could relate adequately to co-workers and supervisors; deal with the public occasionally; and adjust to changes in routine work settings. (AR 58, 419, 655). Nadeau does not contend that the ALJ erred in his assessment of their opinions. Nadeau likewise does not argue that the ALJ erred in his reliance of Dr. Sampson's opinions. Dr. Sampson conducted a consultative examination report, noting that Nadeau's "thought form is logical and goal-directed without evidence of hallucinations or delusions," and assigned her a GAF score of 52, which conveys moderate symptoms. (AR 635). The ALJ noted that Dr. Sampson's findings did not show that Nadeau's "impairments are disabling, but do provide support for concluding that she is limited to one to two step tasks." (AR 58, 637).

The ALJ also relied upon Dr. Ghaffar's treatment notes, in which he noted that medication was effective in controlling her symptoms, and that overall she was doing well. (AR 56-57, AR 339-82). Nadeau contends that the ALJ ignored large portions of those notes, which indicated that she complained of having increased anxiety, depressive symptoms, and panic attacks. She also argues that the ALJ ignored various notes that indicated that her medications for those symptoms had been increased on several occasions. *Id.* However, Dr. Ghaffar's treatment notes from August 2007 through June 2011 were consistent in finding that her mood was stable and that medication was effectively limiting her symptoms. (AR 339-82); *see Sousa*, 783 F. Supp. 2d at 234 ("The hearing officer is not required to—nor could he reasonably—discuss every piece of evidence in the record.").

Finally, Nadeau contends that the ALJ ignored Mugerwa's treatment notes when

assessing her RFC. However, the ALJ relied in part on those notes, indicating that although her

GAF scores were decreasing, she was making progress. (AR 57, 299-301, 305, 311); *see Sousa*,

783 F. Supp. 2d at 234; *Robles*, 2005 WL 1773963, at *4 ("If substantial evidence exists to

support the ALJ's determination, the Court must accept his findings as conclusive even if the

record arguably could justify a different conclusion."). Furthermore, as stated above, the ALJ

properly gave little weight to his opinions. (AR 57).

Accordingly, the ALJ's assessment of the opinion of the medical professionals is

consistent with his overall conclusion that Nadeau's RFC is restricted to light work with

additional limitations. *Irlanda Ortiz v. Secretary of Health and Human Services*, 955 F.2d 765,

769 (1st Cir. 1991) ("It is the responsibility of the [Commissioner] to determine issues of

credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts

in the evidence is for the [Commissioner], not the courts."); *Reyes v. Colvin*, 2015 WL 727935,

at *1 (D. Mass. 2015). Moreover, the ALJ's conclusion that Nadeau's RFC is limited to light

work with additional limitations is supported by substantial evidence. *See Robles*, 2005 WL

1773963 at *4 ("If substantial evidence exists to support the ALJ's determination, the Court must

accept his findings as conclusive even if the record arguably could justify a different

conclusion.").

Nadeau further contends that the ALJ improperly relied upon her testimony concerning

her daily activities. The ALJ noted that Nadeau testified that she is able to maintain personal

hygiene, perform household chores, manage finances, clean, prepare simple meals, shop for

necessities, and socialize with friends. (AR 30-35). Nadeau argues that the ALJ improperly

equated household work to work in the labor force. *See Gentle v. Barnhart*, 430 F.3d 865, 867

(7th Cir. 2005) ("The administrative law judge's casual equating of household work to work in

the labor market cannot stand."). However, the ALJ is allowed to use the performance of household chores as a factor in assessing the credibility of the claimant. *Teixeira v. Astrue*, 755 F. Supp. 2d 340, 346 (D. Mass. 2010) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding."). The ALJ did not "attach significant weight" to Nadeau's testimony, but rather used her testimony of her daily activities as a factor in assessing her credibility. (AR 56); *see Gentle*, 430 F.3d at 867. Moreover, even though Nadeau's mother helped complete some of her household work, such help does not "prevent the hearing officer from using the testimony of [the claimant's] daily activities as one factor in assessing credibility." *See Teixeira*, 755 F. Supp. 2d at 346. Accordingly, the ALJ reasonably relied upon evidence of Nadeau's daily activities in assessing her credibility. *See Irlanda Ortiz*, 955 F.2d at 769. As for her testimony stating that she could not perform household activities approximately three times a week, the ALJ concluded that "some of claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." *See id.*

Finally, Nadeau contends that the ALJ incorrectly concluded that her statements regarding her desire to obtain benefits and stay unemployed further limited her credibility. (AR 59). Again, the hearing officer has the responsibility to determine credibility by making inferences from the record. *Irlanda Ortiz*, 955 F.2d at 769. The ALJ properly relied upon treatment notes from Dr. Ghaffar and South Bay Mental Health in establishing Nadeau's motivation. (AR 59, 335, 341, 365, 370, 373, 448). She contends that the ALJ's conclusions mischaracterize her statements. Regardless, her motivation is but one factor in the ALJ's determination of her credibility. Furthermore, the ALJ relied on several other sources, including

the observations and opinions of medical professionals, that support his conclusion that she had the RFC to perform light work with additional limitations.

## III.  **Conclusion**

For the foregoing reasons, plaintiff's motion for an order to reverse the final decision of the Commissioner of the Social Security Administration is DENIED, and defendant's motion to affirm the action of the Commissioner is GRANTED.

**So Ordered.**


/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: March 24, 2015                    United States District Judge